United States District Court
Southern District of Texas

**ENTERED**

March 12, 2021

Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NUMBER H-20-222 |
| | § | |
| JESSE WALKER | § | |

### MEMORANDUM OPINION AND ORDER

On September 3, 2020, defendant Jesse Walker ("Defendant") filed a Motion to Suppress Evidence (Docket Entry No. 24), to which the government responded by filing The United States of America's Opposition to Defendant's Motion to Suppress on October 7, 2020 (Docket Entry No. 29). A hearing on the motion was held on November 17, 2020 (Docket Entry No. 37), during which the United States called the two arresting officers, Houston Police Department ("HPD") Officers Rolando Foster and Donovan Polk.[1] At the conclusion of the hearing the court ordered the Defendant to file an amended motion to suppress.[2]

Pending before the court is Defendant Jesse Walker's Amended Motion to Suppress (Docket Entry No. 40) pursuant to which the

---

[1]Transcript as to Jesse Walker re Suppression Hearing held on November 17, 2020, before Judge Sim Lake ("Transcript"), Docket Entry No. 38, p. 3. All page numbers for docket entries in the record refer to the pagination inserted at the top of the page by the court's electronic filing system, CM/ECF.

[2]Minute Entry for Hearing held before Judge Sim Lake on Defendant's Motion to Suppress ("Minute Entry"), Docket Entry No. 37, p. 2.

Defendant seeks to suppress (1) the oral statements he made to the police and to Homeland Security Special Agent Kayade Ereme, (2) the pistol found in the center console of his car, and (3) any contents of his cell phone, which was seized by the Houston Police Department.[3]   On January 14, 2021, the United States filed its Opposition to Defendant's Motion to Suppress ("Opposition to Motion to Suppress") (Docket Entry No. 48), then on January 15, 2021, filed an Amended Opposition to Defendant's Motion to Suppress ("Amended Opposition") (Docket Entry No. 49).   Defendant replied on February 1, 2021, in Defendant Jesse Walker's Reply to the Government's Response to His Amended Motion to Suppress Evidence ("Defendant's Reply") (Docket Entry No. 50).   For the reasons stated below, Defendant's Motions to Suppress will be denied.

## I.   Factual Background

On April 30, 2020, HPD Officers Donovan Polk and Rolando Foster were on patrol in their marked police vehicle in the vicinity of South Gessner in Houston, Texas.[4]   The South Gessner area was known to the officers as a high-crime area and one of the most violent in Houston.[5]   The officers were traveling northbound

---

[3]Defendant Jesse Walker's Amended Motion to Suppress Evidence and Memo in Support Thereof ("Amended Motion to Suppress"), Docket Entry No. 40, p. 25.

[4]Houston Police Department Arrest Report ("Arrest Report"), Docket Entry No. 30-1, p. 4.

[5]Transcript, Docket Entry No. 38, p. 7 lines 1-3; p. 47 lines 21-23.

on Hillcroft Avenue when they observed a Nissan Altima about to pull out of the parking lot of a nightclub.[6] The officers knew the nightclub parking lot as the site of past criminal incidents, including shootings and crack cocaine sales.[7] The officers noted that the driver of the Nissan did not turn out of the parking lot immediately, despite having ample time and space to do so, but instead waited several moments for the squad car to pass.[8] Suspecting that the driver of the Nissan might be trying to avoid them, the officers turned onto a side road, waited for the Nissan to exit the nightclub parking lot, and then began to follow.[9]

The driver of the Nissan was driving erratically and moving at a high rate of speed.[10] Although the officers did not clock the Nissan with a radar gun, Officer Foster observed that the speed limit was 35 miles per hour and that he had to drive "[a]t least 45 [miles per hour]" to catch it.[11] Both officers testified and Defendant has never denied that the Nissan's high speed constituted a traffic violation.[12] The officers then observed the Nissan make a left U-turn, during which it cut across three lanes of traffic

---

[6]Id. at 50 lines 5-23.

[7]Id.

[8]Id. at 51 lines 1-3.

[9]Id. lines 11-13.

[10]Arrest Report, Docket Entry No. 30-1, p. 4.

[11]Transcript, Docket Entry No. 38, p. 62 lines 4-9.

[12]Id. at 13 lines 9-12; 51 lines 14-16.

-3-

into the far right-hand lane going the opposite direction.[13]   The
Nissan was now south-bound on Hillcroft Avenue.[14]   The officers
followed.

At this point the officers entered the Nissan's license plate
information into the computer in their police vehicle.   The
computer indicated that, according to the license plate
information, there were open traffic warrants for Defendant.[15]   The
computer also indicated that Defendant was recently released from
incarceration for a felony conviction and was a documented member
of the "Gangster Disciples" criminal street gang.[16]

The Nissan approached a Texaco gas station in the vicinity of
6700 Hillcroft Avenue.[17]  When the police car got behind the Nissan,
the driver of the Nissan "slammed on its brakes, kind of made
evasive movements and turned into the Texaco parking lot."[18]   The
Nissan came to a stop at a gas pump.[19]  The officers then initiated
a traffic stop.[20]

---

[13]Id. at 11 lines 14-15; 12 lines 19-20; 13 lines 2-8.

[14]Id. at 19 lines 3-4.

[15]Id. at 13 lines 13-19.

[16]Id. at 14 lines 7-12; Arrest Report, Docket Entry No. 30-1,
p. 5.

[17]Arrest Report, Docket Entry No. 30-1, p. 4.

[18]Transcript, Docket Entry No. 38, p. 14 lines 15-17.

[19]Id. at 43 lines 19-21.

[20]Arrest Report, Docket Entry No. 30-1, p. 4.

-4-

Defendant was the driver and sole occupant of the vehicle. The officers informed Defendant that they had observed him driving at an excessive speed.[21]  Officer Polk asked Defendant for his name, and he confirmed that it was Jesse Walker, which matched the person on the police computer with outstanding traffic warrants.[22]

The officers then asked Defendant for his identification.[23] Defendant claimed to have a driver's license, but he failed to produce one.[24]  The officers could not see Defendant's hands during this time, but they observed that Defendant was furtively reaching down under his seat and near the center console of the vehicle.[25] Because Defendant's furtive motions caused the officers to become concerned for their own safety, they ordered Defendant out of the vehicle.[26]  For "a long time," "longer than usual at most traffic stops," Defendant made no visible effort to exit his vehicle despite the officers repeatedly asking him to do so.[27]  (This time period lasts approximately 55 seconds on Officer Polk's body-camera

---

[21]Transcript, Docket Entry No. 38, p. 54 line 25 - p. 55 lines 1-4.

[22]Arrest Report, Docket Entry No. 30-1, p. 5.

[23]Motion to Suppress Evidence, Docket Entry No. 24, p. 4.

[24]Transcript, Docket Entry No. 38, p. 27 lines 16-17; p. 53 lines 14-15.

[25]Arrest Report, Docket Entry No. 30-1, p. 5.

[26]Transcript, Docket Entry No. 38, p. 55 lines 18-25 - p. 56 lines 1-11.

[27]Id. at 56 lines 12-21.

-5-

footage.)  During this time the officers informed Defendant that he had outstanding traffic warrants but that he was not being placed under arrest.[28]

When Defendant exited the vehicle, the officers observed that he had a "GD" tattoo, which the officers recognized as consistent with Gangster Disciple criminal street gang membership.[29]  Out of concern for safety, Officer Foster placed Defendant in handcuffs near the rear of Defendant's vehicle.[30]  Officer Foster looked through Defendant's wallet for a driver's license, but did not find one.[31]  The officers determined that Defendant did not have a driver's license with him.[32]

Officer Polk was planning to arrest Defendant at this time for his traffic warrants.[33]  Arresting Defendant would require having his car towed or driven away by a third party, which would in turn require an inventory search.[34] When Officer Polk informed Defendant that his car would be searched, the following exchange took place:

DEFENDANT:     You going to take my vehicle or something?

---

[28]_Id._ at 26 lines 4-15.

[29]_Id._ at 23 lines 20-25.

[30]_Id._ at 59 lines 1-5.

[31]_Id._ at 55 lines 5-17.

[32]_Id._ at 22 lines 8-10; 31 lines 10-15.

[33]_Id._ at 20 lines 4-10.

[34]_Id._ at 22 lines 8-22.

FOSTER:        Yes.

POLK:          You have traffic warrants.

DEFENDANT:     Don't you need a warrant or something to
               search the vehicle?

POLK:          Is there anything I should know about?

DEFENDANT:     Like weed, know what I'm saying?

POLK:          What should I be worried about?  I'm a look.

DEFENDANT:     There's no dope in the car but there may be
               something that you might take me to jail for
               if I tell you.

POLK:          Is it weed?

DEFENDANT:     No.

POLK:          Is it a pistol?

DEFENDANT:     Yeah.

This exchange lasted from 5:15 to 5:52[35] on Officer Polk's body-camera video and from 5:30 to 6:18 on Officer Foster's body-camera video.  Defendant then indicated that the pistol was in the center console, which is where Officer Polk found it at 6:02 on his body-camera video.

Officer Foster completed the tow slip and inventory search paperwork for the vehicle.[36]  Defendant was afforded the opportunity

---

[35]All times refer to the amount of time elapsed as shown on the video file, i.e. "5:15" refers to the period five minutes and fifteen seconds into the video, and "5:52" refers to the period five minutes and fifty-two seconds into the video.

[36]Transcript, Docket Entry No. 38, p. 24 lines 24-25 — p. 25 lines 1-9.

to call someone to pick up the vehicle.[37]  But by the time that person arrived an hour later, Defendant's vehicle was already attached to the tow truck.[38]  Officer Polk testified that once Defendant had been arrested HPD policy would have required him to conduct an inventory search even if the person had arrived earlier to pick up the car.[39]

Meanwhile, Homeland Security Special Agent Kayade Ereme arrived and read Defendant his _Miranda_ warnings, after which Defendant agreed to answer questions and made several post-_Miranda_ statements.  The administration of the _Miranda_ warnings was completed at 13:13 on Officer Foster's body-camera video and at 12:57 on Officer Polk's body-camera video.

A cell phone was also seized from Defendant's car.  Agent Ereme filed an application for a search warrant and an affidavit stating the basis for probable cause to search the phone.[40]  The application was granted, and the contents of the phone were searched pursuant to the warrant.[41]

---

[37]_Id._ at 44 lines 3-5.

[38]_Id._ lines 6-17.

[39]_Id._ at 44 lines 14-21.

[40]Application for a Search Warrant, Affidavit [of Kayade Ereme] in Support of Application for a Search Warrant, and Search and Seizure Warrant (collectively, "Search Warrant Documents"), attached to Government's Opposition to Motion for Return of Property, Docket Entry No. 19-1.

[41]_Id._

## II.  Motion to Suppress

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "Warrantless searches and seizures are presumptively unreasonable, subject to certain exceptions." United States v. McKinney, 980 F.3d 485, 490 (5th Cir. 2020) (citing United States v. Hill, 752 F.3d 1029, 1033 (5th Cir. 2014)).

"[T]he Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands." Arizona v. Evans, 115 S. Ct. 1185, 1191 (1995). But federal courts have established an "exclusionary rule" that, when applicable, forbids the use of illegally obtained evidence during a criminal trial. Herring v. United States, 129 S. Ct. 695, 699 (2009). This rule "encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and . . . 'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.'" Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016) (quoting Segura v. United States, 104 S. Ct. 3380, 3385 (1984)).

"The party seeking suppression 'has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights.'" United States v. Beverly, 943 F.3d 225, 231 (5th Cir. 2019)

(quoting <u>United States v. Wallace,</u> 885 F.3d 806, 809 (5th Cir.
2018)).

Defendant argues that the initial stop of his vehicle was
illegal and that all fruits of that stop — including Defendant's
statements to the officers and the gun and cell phone that were
seized from his car — are inadmissible as fruit of the poisonous
tree.[42]  Defendant also argues that he was under arrest as soon as
Officer Foster informed him that he had outstanding traffic
warrants,[43] that this arrest was a Fourth Amendment violation, and
that all evidence obtained from the arrest must be suppressed.[44]
Finally, Defendant argues that "the <u>un-Mirandized</u> questioning by
Officer Polk was a Fifth Amendment violation," which requires
exclusion of Defendant's statements to Officer Polk,[45] and that his
<u>post-Miranda</u> questioning by Special Agent Ereme was so tainted by
the <u>un-Mirandized</u> questioning that it must also be suppressed.[46]

## A.   Defendant's Traffic Warrants

Defendant argues that the City of Houston's records of cases
against him do not include any arrest warrants, only complaints,[47]

---

[42]Motion to Suppress Evidence, Docket Entry No. 24, pp. 10-11.

[43]Amended Motion to Suppress, Docket Entry No. 40, p. 15.

[44]<u>Id.</u> at 24.

[45]<u>Id.</u>

[46]<u>Id.</u> at 15-16.

[47]Motion to Suppress Evidence, Docket Entry No. 24, p. 6.

seemingly implying that the United States must produce the warrants themselves before the evidence against him can be deemed admissible. Defendant's principal argument is that the complaints underlying the warrants fail to show probable cause, and thus any arrest based on those warrants could not have been lawful.[48]

The United States responds that "as the computer record of an outstanding traffic warrant is sufficient to create probable cause to arrest, there is no duty for the United States to produce the underlying warrant at a suppression hearing."[49]  The United States also argues that "the claim that the arresting officers were required to make a determination as to whether the outstanding traffic warrants were supported by probable cause" is a "red herring" because a "good-faith exception" applies.[50]

### 1.   Applicable Law

In Texas the affidavit to support an arrest warrant and the charging instrument in justice and municipal courts is called a "complaint."  See Tex. Code Crim. Proc. Ann. art. 15.04; Tex. Code Crim. Proc. Ann. art. 45.018.  Complaints upon which arrest warrants are issued must contain sufficient information to show probable cause in order to render a search incident to an arrest legal.  Knox v. State, 586 S.W.2d 504, 506 (Tex. Crim. App. 1979).

---

[48]Id.

[49]Opposition to Motion to Suppress, Docket Entry No. 48, p. 15.

[50]Amended Opposition, Docket Entry No. 49, p. 16.

A complaint that "consists of nothing more than a conclusion" that the defendant perpetrated the offense, while omitting the "actual basis for the complaint's conclusion" does not "set up sufficient information to support an independent judgment that probable cause existed." Id. Such a deficient complaint will render any arrest warrant issued pursuant thereto invalid. See Green v. State, 615 S.W.2d 700, 706-07 (Tex. Crim. App. 1980).

The purpose of the exclusionary rule is to deter police misconduct, not to punish the errors of judges and magistrates. United States v. Leon, 104 S. Ct. 3405, 3417 (1984). For exclusion of evidence to have the desired deterrent effect, "it must alter the behavior of individual law enforcement officers or the policies of their departments." Id. at 3418. Therefore, "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." Id.

"When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant." Herring, 129 S. Ct. at 701 (quoting Leon, 104 S. Ct. at 3420). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Id. at 702.

Leon and Herring both involved search warrants, but the Supreme Court applied similar reasoning to arrest warrants in Evans, 115 S. Ct. 1185.  That case involved an officer who pulled a suspect over for a traffic violation and then "entered [the suspect's] name into a computer data terminal located in his patrol car."  Id. at 1188.  "The computer inquiry confirmed that . . . there was an outstanding misdemeanor warrant for [the suspect's] arrest."  Id.  The officer arrested the suspect based on the warrants, then found a bag of marijuana in the suspect's car.  Id. The suspect moved to suppress the marijuana, arguing that because the warrant had been quashed seventeen days before his arrest, the marijuana was the fruit of an unlawful arrest.  Id.  The Supreme Court disagreed.  Applying Leon, the Court explained that "[i]f court employees were responsible for the erroneous computer record, the exclusion of evidence at trial would not sufficiently deter future errors so as to warrant such a severe sanction."  Id. at 1193.

When arresting officers follow the standard form for warrants and execute those warrants in good faith, their conduct is neither "sufficiently deliberate" nor "sufficiently culpable" to justify the exclusion of evidence.  See United States v. Smith, 354 F. App'x 99, 101 (5th Cir. 2009) (holding that the exclusionary rule did not apply where officers relied on computer database showing that suspect had an active arrest warrant and said warrant followed the "standard form for warrants received from other

-13-

jurisdictions"). "[E]vidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.'" Illinois v. Krull, 107 S. Ct. 1160, 1166 (1987) (quoting United States v. Peltier, 95 S. Ct. 2313, 2320 (1975)).

During a traffic stop "'law-enforcement officers may request information such as a driver's license and vehicle registration, and may conduct a computer check of that information.'" Peña v. State, No. 08-16-00028-CR, 2018 WL 3569367, at *3 (Tex. App.-El Paso July 25, 2018) (citing Kelly v. State, 331 S.W.3d 541, 550 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd). If such a verification reveals outstanding warrants, probable cause to arrest exists. See id.; see also Haley v. State, 480 S.W.2d 644, 645 (Tex. Crim. App. 1972) (stating that probable cause "clearly existed" for arrest when warrant check revealed outstanding warrants); Brooks v. State, 76 S.W.3d 426, 434 (Tex. App.—Houston [14th Dist.] 2002, no pet.) ("[T]he fact that appellant had several outstanding warrants gave the officers probable cause to arrest him."); Hill v. State, No. 13-16-00397-CR, 2017 WL 5505748, at *3 (Tex. App.-Corpus Christi-Edinburg Nov. 16, 2017) ("Generally, an officer has probable cause to arrest a suspect when they know the identity of the suspect and have knowledge of an outstanding arrest warrant.").

2.   <u>Analysis</u>

Officer Polk testified at the suppression hearing that even as Defendant was just exiting the vehicle, he was planning to arrest Defendant based on Defendant's outstanding traffic warrants.[51] Defendant argues that the complaints underlying these warrants do not set forth any basis for a magistrate to make an independent judgment that probable cause existed.[52]  Each of the nine criminal complaints against Defendant that he has produced for the record contains the following conclusory statement:  "I, the undersigned affiant, do solemnly swear that I have good reason to believe and do believe that [Defendant committed the charged offense]."[53] Beyond that, the complaints provide no indicia of probable cause to support an arrest.  The complaints do not set forth the basis for the affiant's belief — whether, for instance, the belief is based on personal knowledge, a confession, or the credible testimony of a witness.  These appear to be the kinds of complaints that were held insufficient in <u>Green,</u> 615 S.W.2d 700 and <u>Knox,</u> 586 S.W.2d 504.

But nothing in the record suggests that Officer Polk was relying on the complaints when he decided to arrest Defendant. Instead, he was relying on computer records showing that Defendant

---

[51]Transcript, Docket Entry No. 38, p. 20 lines 4-10.

[52]Motion to Suppress Evidence, Docket Entry No. 24, p. 8.

[53]Defendant's Exhibits 7-18.

had outstanding warrants.  These computer records were sufficient
to give Polk probable cause to arrest Defendant.  See Peña, 2018
WL 3569367 at *3; Haley, 480 S.W.2d at 645; Brooks, 76 S.W.3d at
434; Hill, 2017 WL 5505748, at *3.  Accordingly, the court
concludes that Defendant's arrest would have been supported by
probable cause even if it were based solely on the computer record
of his outstanding warrants and not on the other factors to be
discussed later in this opinion.  This conclusion forecloses
Defendant's argument that the United States was required to produce
copies of the warrants themselves.

Moreover, the court is not persuaded that applying the
exclusionary rule in this case would further the rule's purpose.
Defendant argues that this case "raises the question of whether a
police officer is reasonably well trained when the municipality
employing and train[ing] him systematically uses municipal court
complaints insufficient to support a warrant and fails to train its
police officers in the invalidity of warrants issued by its
municipal courts."[54]

But since the record does not suggest that the arresting
officers ever saw the complaints, much less relied on them, there
is no reason to suspect that the officers failed to recognize the
complaints' deficiency due to poor training.  Nor is there any
basis to suspect that the officers "had knowledge, or [could]

_____

[54]Motion to Suppress Evidence, Docket Entry No. 24, pp. 9-10.

properly be charged with knowledge," that the complaints were defective. <u>See Krull</u>, 107 S. Ct. at 1166. Instead, the officers reasonably relied in objective good faith on the computer records showing Defendant's outstanding warrants. The court concludes that the officers' conduct was not "sufficiently deliberate" that exclusion could meaningfully deter it, and was not "culpable" in any sense that would warrant deterrence in the first place. <u>See Herring</u>, 129 S. Ct. at 702. Even if the complaints are deficient, suppression of the evidence in this case would serve only to "punish the errors of judges and magistrates," which is not what the exclusionary rule is designed to do. <u>See Leon</u>, 104 S. Ct. at 3417-18.

**B.   The Initial Traffic Stop**

Defendant argues that "the initial stop of the Defendant was a Fourth Amendment violation and all fruits of that stop should be suppressed."[55]   The United States responds that "based on the traffic infractions observed and the indication of traffic warrants in the police computer, the officers lawfully conducted a traffic stop of Defendant's vehicle."[56]

**1.   <u>Applicable Law</u>**

A Fourth Amendment "seizure" occurs when an officer stops a vehicle and detains its occupants. <u>United States v. Smith</u>, 952

---

[55]Motion to Suppress Evidence, Docket Entry No. 24, p. 10.

[56]Amended Opposition, Docket Entry No. 49, p. 2.

F.3d 642, 647 (5th Cir. 2020) (citing United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004)). The Fifth Circuit analyzes the legality of traffic stops for Fourth Amendment purposes under the two-step inquiry articulated by the Supreme Court in Terry v. Ohio, 88 S. Ct. 1868 (1968). Id. This section deals only with the first step of this inquiry.

At this first step the court must determine "whether the stop was justified at its inception." United States v. Bams, 858 F.3d 937, 942 (5th Cir. 2017) (quoting United States v. Andres, 703 F.3d 828, 832 (5th Cir. 2013)). "For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." Id. "Reasonable suspicion exists if the officer can 'point to specific and articulable facts that lead him to reasonably suspect that a particular person is committing, or is about to commit, a crime.'" McKinney, 980 F.3d at 490 (quoting United States v. Hill, 752 F.3d 1029, 1033 (5th Cir. 2014)).

"Reasonable suspicion is a low threshold" and requires only "'some minimal level of objective justification.'" United States v. Castillo, 804 F.3d 361, 367 (5th Cir. 2015) (quoting United States v. Sokolow, 109 S. Ct. 1581, 1585 (1989)). Even if the officer only suspects a minor traffic violation, the initial stop is justified as long as the officer's suspicion is reasonable. See, e.g., United States v. Villafranco-Elizondo, 897 F.3d 635 (5th

Cir. 2018) (holding that a traffic stop was justified at its inception because the officer reasonably suspected a "minor" traffic violation). Reasonable suspicion to stop a vehicle may arise through the "collective knowledge" of the officers involved in the operation. United States v. Zuniga, 860 F.3d 276, 282-83 (5th Cir. 2017) (citing United States v. Powell, 732 F.3d 361, 369 (5th Cir. 2013)).

The constitutional reasonableness of a traffic stop does not depend on the actual motivations of the individual officers involved. Whren v. United States, 116 S. Ct. 1769, 1774 (1996). The "subjective motivations of police are deemed irrelevant as long as their conduct does not exceed what they are objectively authorized to do." Bams, 858 F.3d at 943 (citing United States v. Gillyard, 261 F.3d 506, 509 (5th Cir. 2001)). See also United States v. Magallonn-Lopez, 817 F.3d 671, 675 (9th Cir. 2016) (holding that "[i]f . . . the facts provide probable cause or reasonable suspicion to justify a traffic stop, the stop is lawful even if the officer made the stop only because he wished to investigate a more serious offense."). "Reasonable suspicion can rest upon a mistake of law or fact if the mistake is objectively reasonable." Bams, 858 F.3d at 942 (citing United States v. Alvarado-Zarza, 782 F.3d 246, 249 (5th Cir. 2015)).

2.   Analysis

Defendant's original Motion to Suppress argued that "the video supplied by the Houston Police Department fails to show any traffic

-19-

violations by any person.  It follows that the initial stop of the Defendant was a Fourth Amendment violation and all fruits of that stop should be suppressed."[57]  Defendant's Amended Motion makes the more restrained argument that "[i]t is unclear from the testimony at the hearing on the motion to suppress and the evidence introduced therein whether the officers had probable cause or reasonable suspicion to stop Defendant for a new law violation, that is, a traffic offense."[58]  The United States argues that the officers were justified in stopping Defendant because they observed the Defendant commit traffic violations and because their computer showed outstanding warrants for Defendant.[59]

The officers testified credibly that they observed Defendant commit a traffic violation by speeding.[60]  Defendant poses the rhetorical question "Was the Defendant speeding?"[61] but does not actually deny that he was speeding.  An officer's credible testimony that a defendant was speeding — even when, as here, the officer only "paced" the Defendant's speed instead of clocking it with a radar gun — has been found sufficient to justify an initial stop.  See, e.g., United States v. Castro, 166 F.3d 728, 733 (5th

---

[57]Motion to Suppress Evidence, Docket Entry No. 24, p. 10.

[58]Amended Motion to Suppress, Docket Entry No. 40, p. 8.

[59]Amended Opposition, Docket Entry No. 49, p. 9.

[60]Transcript, Docket Entry No. 38, p. 13 lines 9-12; p. 51 lines 14-16.

[61]Defendant's Reply, Docket Entry No. 50, p. 5.

Cir. 1999); <u>United States v. Archuleta,</u> 463 F. App'x 412, 416 (5th Cir. 2012).   The credible and uncontroverted testimony of two police officers is sufficient for this court to conclude that Defendant violated the speed limit.   Even if the officers were mistaken as to whether Defendant was speeding, that factual mistake would not diminish the officers' legal basis to make the stop.   <u>See Archuleta,</u> 463 F. App'x at 418.   The court concludes that the initial stop of Defendant's vehicle was justified based on the officers' observation that the Defendant was speeding.

The court also concludes that the stop was justified at its inception because the officers observed Defendant making an illegal U-turn.   Officer Polk testified that after Defendant exited the Principe Azul parking lot, Defendant crossed three lanes of traffic to make a U-turn and began driving in the far-right lane going the opposite direction — a move that Officer Polk regarded as a traffic violation.[62]   Texas Transportation Code § 545.101(d) provides that "[t]o turn left, an operator who is approaching an intersection having a roadway designated for one-way traffic and for which signs are posted from a roadway designated for one-way traffic and for which signs are posted shall make the turn as closely as practicable to the left-hand curb or edge of the roadway."

Defendant argues that § 545.101 is inapposite because it applies only to "intersections," and that Defendant made his left

_____

[62]Transcript, Docket Entry No. 38, p. 13 lines 2-8.

turn not in an intersection but out of the parking lot of Principe Azul.[63]   The officers consistently testified that Defendant did not make a left turn but a U-turn.[64]   A U-turn out of the Principe Azul parking lot would have put Defendant back in the Principe Azul parking lot, rather than traveling southbound on Hillcroft Avenue as Officer Polk testified.[65]   A map of the area shows that Hillcroft Avenue consists of two three-lane roadways separated by a median, with one roadway going north and the other going south.[66]   Based on the officers' testimony and the map of the area, the court concludes that Defendant was driving north on Hillcroft, then made a U-turn at the intersection of Hillcroft Avenue and Sands Point Drive to go south on Hillcroft.   Texas Transportation Code § 545.101(d) therefore applies, and the officers were justified in concluding that Defendant violated that statute when he made his U-turn.

Officer Foster testified that the U-turn was illegal.[67] Defendant points out that Officer Foster can be heard on body-camera footage telling Homeland Security Investigations ("HSI") Agent Kayade Ereme that the turn "was not illegal."[68]   The exchange

---

[63]Defendant's Reply, Docket Entry No. 50, p. 10.

[64]Transcript, Docket Entry No. 38, p. 29 line 25; p. 67 line 7.

[65]Id. at 19 lines 3-4.

[66]Map, Exhibit 1 to Opposition to Motion to Suppress, Docket Entry No. 48-1.

[67]Transcript, Docket Entry No. 38, p. 67 line 6.

[68]Defendant's Reply, Docket Entry No. 50, p. 10.

took place at approximately 31:16 on Officer Polk's body-camera footage. But Officer Polk testified that the turn was a traffic violation,[69] and nothing in the record suggests that he ever contradicted that testimony. Even if Officer Foster did not initially suspect that Defendant's erratic turn was illegal, his lack of personalized suspicion is immaterial — under the collective knowledge doctrine, it would be enough if Officer Polk knew that the turn was illegal and the officers were in constant communication before and during the traffic stop. See Zuniga, 860 F.3d at 283. More importantly, the objective reasonableness of the stop does not depend on the subjective intent of the officers who made it. Whren, 116 S. Ct. at 1774 (1996). Defendant's U-turn was illegal, and the officers were objectively authorized to stop him for it — their subjective motivations are irrelevant. See Bams, 858 F.3d at 943.

The court also concludes that the traffic stop was constitutionally permissible because the officers possessed a reasonable suspicion that the Defendant was committing or about to commit a crime. See McKinney, 980 F.3d at 490. Federal courts "look at 'the totality of the circumstances' in determining whether an officer had a particularized and objective basis for suspecting criminal activity." United States v. Reyes, 963 F.3d 482, 488 (5th Cir. 2020) (quoting Kansas v. Glover, 140 S. Ct. 1183, 1191

---

[69]Transcript, Docket Entry No. 38, p. 13 lines 2-8.

(2020)).   This  analysis  is  necessarily  fact-specific  because
observations capable of innocent explanation when considered alone
might rise to the level of reasonable suspicion in the aggregate.
McKinney, 980 F.3d at 491 (citing United States v. Arvizu, 122
S. Ct. 744, 747 (2002)).  For instance, "nervous, evasive behavior
is a pertinent factor in determining reasonable suspicion," but
there is no bright-line rule that flight by itself establishes
reasonable suspicion.  Hill, 752 F.3d at 1036 (quoting Illinois v.
Wardlow, 120 S. Ct. 673, 674 (2000)).  Similarly, a suspect's
presence in a high-crime area is pertinent, but "standing alone, is
not enough to support a reasonable, particularized suspicion that
the person is committing a crime." Wardlow, 120 S. Ct. at 676.
When these two factors are combined, however, and a suspect engages
in "unprovoked flight" from a high-crime area, a reasonable
suspicion of criminal activity may arise.  Id.

     As explained above, the officers credibly and undisputedly
testified that (1) they observed Defendant in a high-crime area,
(2) the specific nightclub parking lot that Defendant was exiting
was known for drug deals and violent crime, (3) Defendant waited to
pull out of the nightclub parking lot until the officers had passed
him, (4) Defendant made a sudden and evasive turn into the Texaco
parking lot when the officers got behind him, (5) Defendant came to
a stop at a gas pump but did not exit his vehicle or make any
visible attempt to get gas, and (6) the squad-car computer
indicated that Defendant was a gang-affiliated felon with

outstanding traffic warrants.  In isolation, not all of these facts would necessarily justify a Terry stop.  But the court finds that in the aggregate they gave rise to the officers' reasonable suspicion that criminal activity was afoot.

Defendant's outstanding traffic warrants, which the officers accessed before initiating their traffic stop, provide a final independent basis for the stop.  Texas courts have consistently held that officers may justifiably initiate a traffic stop based on information they find in their squad-car computers.  See, e.g., Portis v. State, No. 10-09-00343-CR, 2011 WL 5221239, at *2 (Tex. App.—Waco Oct. 26, 2011) (officer was justified stopping motorist because computer indicated motorist's registration had expired); Delk v. State, 855 S.W.2d 700, 709-10 (Tex. Crim. App. 1993) (investigatory stop was justified because car parked outside building was listed as stolen on police computer); Kelly v. State, 721 S.W.2d 586, 587 (Tex. App.—Houston [1st Dist.] 1986, no writ) (stop of defendant was justified because computer indicated defendant's car was stolen, even though this information later turned out to be erroneous).

On each of the independent grounds stated above, the court concludes that the stop was justified at its inception.

## C.   Defendant's Pre-Miranda Statements During Traffic Stop

Defendant argues that he was under arrest as soon as Officer Polk told him that there were outstanding traffic warrants in his

name.[70]  Accordingly, Defendant argues that any statements he made between the time that he was informed of the warrants and the time that he was read his <u>Miranda</u> warnings must be suppressed.[71]  This would include his admission that there was a pistol in his car. The United States argues that facts emerged during the traffic stop that were "sufficient to create a reasonable suspicion in the deputies' minds that there was criminal activity, thus justifying the decision to further detain [Defendant]."[72]  The United States further argues that even if Defendant was under arrest and not merely being detained when he made his <u>pre-Miranda</u> statements to Officer Polk, "Defendant's responses are still admissible" under the public-safety exception to <u>Miranda</u>.[73]

### 1.  <u>Applicable Law</u>

If the court finds that a traffic stop was justified at its inception, it must then determine "'whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop of the vehicle in the first place.'"  <u>Bams</u>, 858 F.3d at 943 (quoting <u>Andres</u>, 703 F.3d at 832). "A seizure for a traffic violation justifies a police investigation of that violation."  <u>Rodriguez v. United States</u>, 135 S. Ct. 1609,

---

[70]Amended Motion to Suppress, Docket Entry No. 40, p. 15.

[71]Defendant's Reply, Docket Entry No. 50, p. 4.

[72]Amended Opposition, Docket Entry No. 49, p. 13.

[73]<u>Id.</u> at 21.

1614 (2015).   "As part of that investigation, 'an officer may examine driver's licenses and vehicle registrations and run computer checks.'" Smith, 952 F.3d at 647 (quoting United States v. Pack, 612 F.3d 341, 350, modified on denial of reh'g, 622 F.3d 383 (5th Cir. 2010)).

There is no hard-and-fast time limit for 'reasonable' traffic stops." Smith, 952 F.3d at 647.   Instead the stop must be "temporary" and must last "no longer than is necessary to effectuate the purpose of the stop," unless further reasonable suspicion, supported by articulable facts, emerges. McKinney, 980 F.3d at 490.   "[I]f 'additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed.'" United States v. Banuelos-Romero, 597 F.3d 763, 767 (5th Cir. 2010) (quoting United States v. Lopez-Moreno, 420 F.3d 420, 431 (5th Cir. 2005)).   Particular suspicion of a specific crime is not required to continue the detention.   See Pack, 612 F.3d at 355.

The government may not use statements stemming from the "custodial interrogation" of a defendant unless it demonstrates that the defendant was warned before questioning that he had a right to remain silent, that any statement he makes may be used against him, and that he has a right to an attorney. Miranda v. Arizona, 86 S. Ct. 1602, 1612 (1966).   "A suspect is . . . 'in custody' for Miranda purposes when placed under formal arrest or

⋮

when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." United States v. Wright, 777 F.3d 769, 774 (5th Cir. 2015) (quoting United States v. Bengivenga, 845 F.2d 593, 596 (5th Cir. 1988)). Whether a suspect is "in custody" is an objective inquiry — the subjective views of either the interrogating officer or the person being questioned are irrelevant. Id. (citing J.D.B. v. North Carolina, 131 S. Ct. 2394, 2402 (2011)).

To determine whether a person was in custody "courts must examine all of the circumstances surrounding the interrogation," including "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." Howes v. Fields, 132 S. Ct. 1181, 1189 (2012) (internal quotations and citations omitted). See also United States v. Salinas, 543 F. App'x 458, 463 (5th Cir. 2013) ("In general, we have held that custodial interrogation requires some combination of isolation, restriction of movement, physical restraint, and coercive technique."). Accordingly, the "temporary and relatively nonthreatening detention involved in a traffic stop or Terry stop does not constitute Miranda custody." Maryland v. Shatzer, 130 S. Ct. 1213, 1224 (2010) (citations omitted). See also Reyes, 963 F.3d at 490 ("[A] person detained in a routine traffic stop is not 'in custody' for

-28-

_Miranda_ purposes."); _United States v. Coleman,_ 610 F. App'x 347, 353 (5th Cir. 2015) (per curiam) ("It is well-established that ordinary traffic stops do not place a person 'in custody' for purposes of _Miranda._").

A handcuffed suspect is not necessarily "in custody" for _Miranda_ purposes. _Dolph v. Davis,_ 765 F. App'x 986, 991 (5th Cir. 2019). _See also Fields,_ 132 S. Ct. at 1189 ("Not all restraints on freedom of movement amount to custody for purposes of _Miranda._"); _United States v. Davis,_ 773 F.3d 334, 340 (1st Cir. 2014) ("[W]e have never held that the use of handcuffs necessarily renders a probationer in custody for _Miranda_ purposes. Nor has the Supreme Court so held.").

2. <u>Analysis</u>

After initially stopping Defendant, Officers Foster and Polk engaged in the normal investigative steps that accompany a traffic stop: They asked for Defendant's driver's license and confirmed that he was the person they had identified on their squad-car computer. _See Smith,_ 952 F.3d at 647. In the course of these steps, the officers observed that Defendant (1) could not produce a driver's license, (2) was not responding to their commands, (3) was furtively reaching for something they could not see, (4) had tattoos indicating gang affiliation, and (5) was the same person whom they had identified on their squad-car computer as having traffic warrants, gang ties, and a record as a felon. The

court concludes that these facts were sufficient to create reasonable suspicion in the officers' minds that criminal activity was afoot, thus justifying their decision to further detain Defendant. <u>See Banuelos-Romero,</u> 597 F.3d at 767.

The court also concludes that handcuffing the Defendant during the investigatory stop was a reasonable safety precaution for the officers to take under the circumstances, and that taking this action did not convert the investigatory stop into an arrest. <u>See United States v. Abdo,</u> 733 F.3d 562, 565-66 (5th Cir. 2013) (holding that officers were justified in handcuffing suspect and placing him in squad car because they reasonably suspected he was armed and dangerous, and handcuffing suspect did not place him under arrest); <u>United States v. Jordan,</u> 232 F.3d 447, 450 (5th Cir. 2000) (holding that "[h]andcuffing a suspect does not automatically convert an investigatory detention into an arrest requiring probable cause" where handcuffs are used long enough to frisk a suspect who did not fully comply with police orders).

When Defendant told Officers Foster and Polk that there was a pistol in his car he was not isolated — he was standing beside his car in broad daylight in a parking lot that was accessible to the public. He was responding to questioning that had lasted approximately 45 seconds. The record does not suggest that he was coerced or threatened. Although he was handcuffed, that factor is not dispositive and does not outweigh the fact that Defendant's interrogation was brief, public, and nonthreatening. Moreover,

Defendant had been explicitly told that he was not under arrest.[74]
The court concludes that Defendant's statements were not made
during a custodial interrogation but rather during an investigative
detention as part of a Terry stop, and thus Miranda does not
provide a basis to suppress his statements.

The court also concludes that even if Defendant was under
arrest when Officer Polk asked him whether there was anything in
the car that he should be concerned about, Defendant's responses
are admissible under the "public safety" exception to Miranda.
"The public safety exception to Miranda allows the admission as
evidence of statements given by a defendant before being given
Miranda warnings when a situation posing a threat to the public
safety exists." United States v. Lim, 897 F.3d 673, 690 (5th Cir.
2018) (quoting United States v. Brathwaite, 458 F.3d 376, 382 n.8
(5th Cir. 2006)).  This exception, first articulated in New York v.
Quarles, 104 S. Ct. 2626, 2631 (1984), is narrowly drawn to allow
officers to react to emergencies where "spontaneity rather than
adherence to a police manual is necessar[y]."

The Fifth Circuit has applied the public safety exception when
officers did not Mirandize a suspect out of concern for their own
safety.  See, e.g., United States v. Webster, 162 F.3d 308, 332
(5th Cir. 1998) ("[T]he police acted constitutionally when they
asked [the defendant] whether he had any needles in his pockets

---

[74]Transcript, Docket Entry No. 38, p. 26 lines 4-15.

that could injure them during their pat down; such questioning, needed to protect the officers, does not constitute interrogation under Miranda . . . ."); United States v. Lee, 188 F. App'x 326, 328 (5th Cir. 2006) (holding that investigator could ask a handcuffed defendant who had not been Mirandized where his gun was "[b]ecause the investigator's questions were based on his concern about the safety of the officers at the scene and the numerous onlookers . . . ."). In United States v. Kelley, 268 F. App'x 304 (5th Cir. 2008) (per curiam), the Fifth Circuit held:

> After [suspect] was handcuffed and arrested and before he was Mirandized, [suspect] told a police officer where firearms could be located in his residence in response to the officer's question. Because the officer's question was based on his concern about the safety of the officers on the scene and before the officers had completed a protective sweep of the residence, the district court did not err in denying [suspect]'s motion to suppress.

Defendant essentially argues that because he was handcuffed and out of the car, and because "the area was secure," any exigency that might have justified applying the public safety exception had passed.[75] But the decisions cited above demonstrate that the fact that Defendant was handcuffed, while relevant, is far from dispositive. Body-camera footage shows that Defendant was by the trunk of his car, only a step or two away from reaching the pistol in his center console. The stop was in a public place in a high-crime area, not far from a parking lot that the officers knew as the site of shootings and other crimes. Given Defendant's gang

---

[75]Defendant's Reply, Docket Entry No. 50, pp. 17-18.

affiliation, the officers would have had no idea whether one or
more accomplices might be nearby.   The officers acted constitu-
tionally and in the interest of their own safety when they asked
what was in the car, their questions were not interrogation for
<u>Miranda</u> purposes, and thus Defendant's answers will not be
suppressed.

D.   **The Firearm and Cell Phone in Defendant's Vehicle**

Defendant argues that because his arrest violated the Fourth
Amendment, all fruits of the arrest, including the pistol and cell
phone found during the search of his car, must be suppressed.[76]   The
United States argues that the recovery of the pistol was lawful
based on (1) the probable cause from Defendant's admission that the
firearm was present, and (2) the officer's intention to inevitably
conduct an inventory search of the vehicle because they would not
let him operate the vehicle after they confirmed that he was the
person wanted for traffic warrants.[77]   The United States argues that
"the search of the cellular phone was proper as it was supported by
probable cause as explained in the affidavit accompanying the
search warrant of that phone."[78]

_____

[76]Amended Motion to Suppress, Docket Entry No. 40, p. 24.

[77]Amended Opposition to Motion to Suppress, Docket Entry
No. 49, p. 2.

[78]Opposition to Defendant's Motion to Suppress, Docket Entry
No. 48, p. 3.

1.   <u>Applicable Law</u>

"Under the Fourth Amendment, '[w]arrantless searches and seizures are per se unreasonable unless they fall within a few narrowly defined exceptions.'" <u>Rountree v. Lopinto</u>, 976 F.3d 606, 609 (5th Cir. 2020) (quoting <u>United States v. Kelly</u>, 302 F.3d 291, 293 (5th Cir. 2002)).   One such exception is the "automobile exception," which "permits the 'police to search a vehicle if they have probable cause to believe that the vehicle contains contraband.'"   <u>Id.</u> (quoting <u>United States v. Fields</u>, 456 F.3d 519, 523 (5th Cir. 2006)).   "Probable cause exists when facts and circumstances within the knowledge of the arresting officer would be sufficient to cause an officer of reasonable caution to believe that an offense has been or is being committed." <u>United States v. Ned</u>, 637 F.3d 562, 567 (5th Cir. 2011) (quoting <u>United States v. Carrillo-Morales</u>, 27 F.3d 1054, 1062 (5th Cir. 1994)).

Another exception is the "inevitable discovery doctrine," which holds that physical evidence obtained without a warrant is nonetheless admissible if the prosecution can establish by a preponderance of the evidence that it would have inevitably been discovered by lawful means.   <u>United States v. Hernandez</u>, 670 F.3d 616, 623 (5th Cir. 2012) (citing <u>Nix v. Williams</u>, 104 S. Ct. 2501, 2509 (1984)).   The government must also show that it "was actively pursuing a substantial alternate line of investigation at the time of the constitutional violation." <u>United States v. Zavala</u>, 541 F.3d 562, 579 (5th Cir. 2008).   "For the inevitable discovery exception to apply, 'the alternate means of obtaining the evidence

must at least be in existence and, at least to some degree, imminent, if yet unrealized.'" Id. at 580 (quoting United States v. Cherry, 759 F.2d 1196, 1205 n.10 (5th Cir. 1985)).

The final relevant exception, the "inventory search," allows officers to search a soon-to-be-impounded vehicle and inventory its contents.

> [A]n inventory search of a seized vehicle is reasonable and not violative of the Fourth Amendment if it is conducted pursuant to standardized regulations and procedures that are consistent with (1) protecting the property of the vehicle's owner, (2) protecting the police against claims or disputes over lost or stolen property, and (3) protecting the police from danger.

United States v. McKinnon, 681 F.3d 203, 209 (5th Cir. 2012) (quoting United States v. Lage, 183 F.3d 374, 380 (5th Cir. 1999)).

The Fifth Circuit often applies the inevitable discovery doctrine in cases where evidence is obtained without a warrant from a vehicle that was about to be subjected to an inventory search. See, e.g., United States v. Ochoa, 667 F.3d 643, 650 (5th Cir. 2012) ("[W]e need not determine whether the search itself was proper because, in any event, the cell phone would have inevitably been discovered pursuant to law enforcement's routine inventory search of the vehicle."); United States v. Seals, 987 F.2d 1102, 1108 (5th Cir. 1993) ("We conclude that the rifle and crack cocaine would have been inevitably discovered during the normal inventory procedures of the Shreveport Police Department. Defendant's motion to suppress was properly denied not only as a result of the officers' probable cause to search the vehicle, but also under the

inevitable discovery rule."); <u>United States v. Casper</u>, 353 F. App'x
976 (5th Cir. 2009) (affirming district court's holding that
evidence obtained from an illegal search of a vehicle was
admissible because it would inevitably have been discovered in an
inventory search).

2.  <u>Analysis</u>

Defendant told the officers that there was a pistol in his
vehicle. By this time the officers already knew that Defendant was
a felon recently released from incarceration.  The court concludes
that the facts within the officers' knowledge were sufficient to
cause an officer of reasonable caution to believe that the crime of
"felon in possession of a firearm" had been committed.  <u>See Ned</u>,
637 F.3d at 567.  The court thus concludes that the officers had
probable cause to search the vehicle, and the physical evidence
they retrieved is admissible.

The court also concludes that all the evidence found in the
car would have inevitably been discovered through an inventory
search.  It is HPD policy that "[w]henever an officer authorizes a
nonconsent tow of a prisoner's vehicle, the officer shall
personally conduct an inventory of items in the vehicle including
any and all containers not secured by a lock and shall complete a
wrecker slip."[79]  Officer Polk testified that he would have had to

---

[79]HPD General Order #600-10, Issue Date November 29, 2016, p. 7.

inventory-search the vehicle even if the person Defendant called to pick it up had arrived before the tow truck.[80]  It follows that the physical evidence retrieved from Defendant's car would have inevitably been found in the inventory search, whether Defendant had supplied the officers with probable cause to search the car or not.  See Ochoa, 667 F.3d at 650 ("[T]he cell phone would have inevitably been discovered pursuant to law enforcement's routine inventory search of the vehicle.").

Defendant also argues that the cell phone should be suppressed because it is the fruit of an unlawful arrest and unlawful pre-Miranda questioning.[81]  For the reasons explained above, the court has concluded that the arrest and the pre-Miranda questioning were lawful.  Moreover, the contents of the cell phone were searched pursuant to a search warrant supported by an affidavit from Special Agent Ereme.[82]  Defendant does not argue that the warrant or the affidavit is deficient.  The court concludes that Defendant has failed to meet his burden of proving, "'by a preponderance of the evidence, that the [cell phone] was obtained in violation of his Fourth Amendment rights.'"  Beverly, 943 F.3d at 231 (quoting Wallace, 885 F.3d at 809).

---

[80]Transcript, Docket Entry No. 38, p. 44 lines 14-21.

[81]Amended Motion to Suppress, Docket Entry No. 40, p. 24.

[82]Search Warrant Documents, attached to Government's Opposition to Motion for Return of Property, Docket Entry No. 19-1.

.

**E.   Defendant's <u>Post-Miranda</u> Statements**

Defendant was arrested, <u>Mirandized,</u> and further interrogated by HSI Agent Kayade Ereme shortly after Defendant's pistol was recovered.   Defendant argues that his <u>post-Miranda</u> statements to Agent Ereme should be suppressed because the <u>post-Miranda</u> questioning relied on <u>pre-Miranda</u> statements Defendant had made to Officer Polk, a procedure that Defendant says "resembles the two-step, question then <u>Mira[n]dize</u> approach condemned in <u>Missouri v. Seibert,</u> [124 S. Ct. 2601] (2004)."[83]

The United States responds that "there was no deliberate two-step strategy" in this case, and that "the <u>Miranda</u> warnings and questioning associated therewith were undertaken by a completely different agency than that conducting the traffic stop and asking the <u>pre-Miranda</u> questioning."[84]   The United States thus argues that "Agent Ereme's subsequent administration of <u>Miranda</u> removed any conditions that may have made the earlier statements inadmissible."[85]

1.   <u>Applicable Law</u>

<u>Seibert</u> dealt with a suspect who had been questioned without <u>Miranda</u> warnings for 15-20 minutes in a police station, made an

---

[83]Amended Motion to Suppress, Docket Entry No. 40, p. 16.

[84]Amended Opposition, Docket Entry No. 49, p. 25.

[85]<u>Id.</u>

-38-

incriminating statement, then was given a 20-minute break.   124
S. Ct. at 2602.   After the break the interrogating officer turned
on his tape recorder, obtained a written Miranda waiver, and
obtained a statement from the suspect relating the same facts.   Id.
Justice Kennedy, writing the concurrence that became the Court's
holding, stated that the police had used a "two-step questioning
technique based on a deliberate violation of Miranda . . . .
This tactic relies on an intentional misrepresentation of the
protection that Miranda offers and does not serve any legitimate
objectives that might otherwise justify its use."   Id. at 2615.

Seibert "'requires the suppression of a post-warning statement
only where a deliberate two-step strategy is used and no curative
measures are taken.'"   Lim, 897 F.3d at 692.   "'[W]here that
strategy is not used, the admissibility of post-warning statements
continues to be governed by the principles of' Oregon v. Elstad,
. . . 105 S. Ct. 1285 . . . (1985)."   Id.   That case "allow[s] a
post-warning confession even where the police had previously
obtained a pre-warning confession, so long as the pre-warning
confession was voluntary."   United States v. Nunez-Sanchez, 478
F.3d 663, 668 (5th Cir. 2007).

2.   Analysis

Defendant concedes that "Justice Kennedy's approach seems to
be limited to instances where there is a deliberate use of the two-

step, question first, <u>Mirandize</u> later technique to skirt the <u>Miranda</u> warnings."[86]  Defendant further concedes that "[i]n the instant case, there is no evidence that Officer Polk and Agent Ereme had planned the two-step approach."[87]

The court agrees, and thus concludes that <u>Seibert</u> does not apply here.  Instead, the court applies the framework set forth in <u>Elstad</u> and concludes that Defendant's voluntary pre-warning confession renders his post-warning statements admissible.  <u>See</u> <u>Nunez-Sanchez,</u> 478 F.3d at 668.

### III.  <u>Conclusions and Order</u>

For the reasons explained above, Defendant's Motion to Suppress Evidence (Docket Entry No. 24) and Defendant Jesse Walker's Amended Motion to Suppress Evidence (Docket Entry No. 40) are **DENIED**.

This case is set for trial on May 10, 2021, at 1:00 p.m. in Courtroom 9-B, Ninth Floor, United States Courthouse, 515 Rusk Street, Houston, Texas 77002.

Motions in limine will be filed by April 2, 2021, and responses by April 16, 2021.

The parties will file exhibit lists, copies of exhibits, witness lists, and proposed jury charges by May 3, 2021.

---

[86]Amended Motion to Suppress, Docket Entry No. 40, p. 17.

[87]<u>Id.</u>

The court will conduct a final pretrial conference on May 6, 2021, at 11:30 a.m.

**SIGNED** at Houston, Texas, on this the 12th day of March, 2021.

_____
SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE